**LOUIS W. AND MAUD HILL FAMILY FOUNDATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 3–69–Civ.–96.**

United States District Court,
D. Minnesota,
Third Division.

Oct. 3, 1972.

Doherty, Rumble & Butler, Irving Clark and Boyd H. Ratchye, St. Paul, Minn., for plaintiff.

Robert G. Renner, U. S. Atty., Scott P. Crampton, Asst. Atty. Gen., Donald R. Anderson and Thomas R. Jones, Attys., Dept. of Justice, for defendant.

## MEMORANDUM and ORDER

DEVITT, Chief Judge.

At issue in this civil tax refund action to recover $256,808.44 assessed tax and interest paid is whether during the years 1959 through 1964 the plaintiff foundation received "unrelated business income" from the proceeds of two timber cutting contracts within the meaning of § 512 of the Internal Revenue Code.

Most of the facts have been stipulated. Depositions were received in evidence. One witness testified. Plaintiff foundation was established by Louis W. Hill in 1934 and is exempt from income taxes under I.R.C. (1954) § 501(c)(3).

In 1912 Louis W. Hill acquired large tracts of timber property in Linn County, Oregon. In 1917 he transferred ⅝ths of this property to various trusts created for the benefit of his family.

This property, as well as the property retained by Louis W. Hill, was held by the parties without development until the 1940's, when two lumber companies expressed interest in purchasing the timber. In early 1946 Louis W. Hill and the trustees of the family trusts negotiated a long term cutting contract for the sale of part of their timber to the Willamette National Lumber Company. Later in 1946 they negotiated a similar contract for other timber with the Santiam Lumber Company. The Foundation was a party to the latter contract, as it had received a small portion of the timberland from Louis W. Hill by gift. For the most part, however, the Foundation did not enter the picture until 1952, when it inherited the bulk of its ⅙th interest or about 38,000 acres from Louis W. Hill's estate.

The contracts provided that the lumber companies would cut and manufacture a minimum number of board feet per year averaged over a five year period. The contracts were to extend over a term of 15 years; this period was later extended. The sellers (collectively referred to as the "Hill Group") were to be paid according to a complex price formula. In substance it provided that the Hill Group would receive:

1. A basic minimum payment regardless of the lumber companies' profit or loss in any given year.

2. 50% of the profit realized by Willamette from the sale of Hill timber; 60% of the profit realized by Santiam from the sale of Hill timber.

3. 10% of the profit realized by the lumber companies from the sale of timber cut from lands not owned by the Hill Group.

4. A proportion of the profits realized by the lumber companies from all other operations, including:

   a. The sale of power, wood chips and hogged fuel (wood and bark remnants from the sawmill operation);

   b. The sale of lumber bought and resold by the lumber companies;

   c. The sale of other forest products bought and resold by the lumber companies;

   d. The sale of products from any retail department operated by the lumber companies;

   e. The sale of used machinery, equipment and similar items;

   f. The receipt of certain insurance benefits.

In 1962 the Internal Revenue Service ruled that the Foundation was engaged in a "trade or business" unrelated to its exempt purposes and was subject to the unrelated business income tax under I.R.C. (1954) § 511(a). However, in view of the exceptions contained in I.R.C. (1954) § 512(b)(5), the IRS held that income realized from the sale of Hill timber (under #2 above) was excludable from unrelated business income.

Following the ruling, a deficiency was assessed, it was paid, a claim for refund was timely filed and denied, and this action for refund was instituted.

The Court has jurisdiction under 28 U.S.C. §§ 1346(a)(1) and 1402(a)(2).

The pertinent provisions of the Internal Revenue Code may be summarized as follows.

Gross income means income from whatever source derived, including gains from dealings in property I.R.C. (1954) § 61(a).

Exempt organizations as a general rule do not have to pay tax on their income. I.R.C. (1954) § 501(a).

But if exempt organizations receive unrelated business income, they must pay tax on it. I.R.C. (1954) § 511.

Unrelated business income does not include gains on the sale or exchange of property. I.R.C. (1954) § 512(b)(5).

An outright sale or a disposal of timber with a retained economic interest may constitute a sale or exchange of property, excludable from unrelated business income. I.R.C. §§ 512(b)(5) and 631(b).

The threshold question is whether the Foundation received "unrelated business

income" as defined in §§ 511 and 512. If this issue is resolved favorably to the Foundation, we need go no further. If it is not such income, it is exempt from taxation by virtue of § 501(a). On the other hand, if the Foundation did receive unrelated business income, consideration must be given to the exclusions provided in §§ 512(b)(5) and 631(b).

Section 512(a)(1) provides in relevant part that "the term 'unrelated business taxable income' means the gross income derived by any organization from any unrelated trade or business (as defined in section 513) regularly carried on by it". Section 513(a) merely explains that the term "unrelated" means unrelated to an organization's exempt purposes.

Defendant argues that the plaintiff Foundation was engaged in a trade or business unrelated to the Foundation's purposes and was in effect a joint venturer or partner with the lumber companies and hence the income from the lumber cutting contracts is taxable under § 511. The Foundation denies this and claims it was merely a passive investor and the recipient of exempt income.

For the years at issue the law contained no definition of "trade or business." By amendment effective January 1, 1970 Congress provided that the term "includes any activity which is carried on for the production of income from the sale of goods or the performance of services." I.R.C. (1954) § 513(c). The only regulation touching upon the definition for the years in question is Regulation § 513–1(b). It refers to the meaning of the phrase under I.R.C. (1954) § 162. However, neither § 162 nor the regulations under it define the phrase further. Thus, resort must be had to legislative history, case law and common understandings of the term.

▮ The legislative history of §§ 511, 512 and 513 reflects that in enacting these statutes the Congress was attempting to eliminate a source of unfair business competition by placing the unrelated business activities of exempt organizations upon the same tax basis as non-exempt business endeavors with which they competed. Treas.Reg. § 513–1(b). Hearings on the Revenue Act of 1950 revealed that exempt organizations were using their tax-exempt status to purchase ordinary businesses and to pay for them in installments out of subsequent tax exempt earnings, and were expanding existing business operations with tax free profits. See H.Rep.No. 2319, 81st Cong., 2nd Sess. at 36; Sen. Rep.No. 2375, 81st Cong., 2nd Sess at 28, 1950 U.S.Code Cong.Serv., p. 3053. See generally 6 Mertens § 34.14a at 74. The courts had generally ignored these aspects of unfair competition, preferring instead to apply a "destination of income test" to exempt organizations in determining the taxability of their income. See, e. g. Trinidad v. Sagrada Orden de Predicadores, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458 (1924); C. F. Mueller Co. v. Commissioner, 14 T.C. 922 (1950), rev'd 190 F.2d 120 (3rd Cir. 1951). With the enactment of §§ 511, 512 and 513, charity-owned or charity-operated businesses were placed on the same tax basis as any active business notwithstanding the income derived therefrom was used for charitable purposes.

Although there are no reported cases involving timber sales under the statutes here involved, there are cases factually similar to the instant case decided under other sections of the Internal Revenue Code. These cases find a taxpayer selling timber and seeking capital gains treatment under I.R.C. (1954) § 1221(1); I.R.C. (1939) § 117. The wording of these provisions differ somewhat in that they refer to property "held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business". Nevertheless, the cases are helpful in illustrating the factors courts look to in determining whether a timber owner, who has sold his timber under a long term contract, is engaged in a trade or business.

It appears from the decisions that important considerations in determining the question are the intent of the taxpayer in acquiring the property, the regularity or continuity of the taxpayer's activities with respect to the property, the number of separate sales or transactions, the taxpayer's role with respect to the property after sale, and whether the taxpayer is basically engaged in earning a livelihood, is engaged in investment activities, or is working at an avocation. The cases which have found a timber owner not to have been engaged in a trade or business have done so upon a showing that the owner was not active in successive sales and was limited to receiving payment under the contracts after sale. *See, e. g.,* United States v. Robinson, 129 F.2d 297 (5th Cir. 1942): Estate of M. M. Stark v. Commissioner, 45 B.T.A. 882 (1941); Isaac. S. Pebbles, Jr. v. Commissioner, 5 T.C. 14 (1945). The cases which have found the taxpayer to have been engaged in a trade or business have usually involved multiple sales. *See, e. g.,* Wineberg v. Commissioner, 326 F.2d 157 (9th Cir. 1963); Patterson v. Belcher, 302 F.2d 289 (5th Cir.) modified in 305 F.2d 557, cert. denied, 371 U.S. 921, 83 S.Ct. 289, 9 L.Ed.2d 230 (1962). Or the contracts have involved such substantial frequency, regularity, and continuity of activity as to point to employment relationships rather than sales, and hence have been found to be a trade or business. *See, e. g.,* Commissioner v. Boeing, 106 F.2d 305 (9th Cir.), cert. denied, 308 U.S. 619, 60 S.Ct. 295, 84 L.Ed. 517 (1939). More recently the Fifth Circuit found taxpayers to have been engaged in a trade or business where the taxpayers failed to introduce any evidence indicating that they acquired and held the timber property for investment purposes. Crosby v. United States, 414 F.2d 822 (5th Cir. 1969).

The case of McDowell v. Ribicoff, 292 F.2d 174 (3rd Cir.) cert. denied, 368 U. S. 919, 82 S.Ct. 240, 7 L.Ed.2d 135 (1961), is helpful in defining the phrase.

After an examination of cases under §§ 162 and 165, the Court stated:

"The phrase 'trade or business' connotes something more than an act or course of activity engaged in for profit. Indeed, the Internal Revenue Code itself, in Section 165(c), 26 U.S. C. § 165(c), distinguishes between a 'trade or business' on the one hand and a 'transaction entered into for profit' on the other. *The phrase 'trade or business' must refer not merely to Acts engaged in for profit, but to extensive activity over a substantial period of time during which the Taxpayer holds himself out as selling goods or services.*" 292 F.2d at 178. (emphasis added)

In the case at bar it is clear that neither the Foundation, as a part of the Hill Group, nor its agents have engaged in extensive activity over a substantial period of time. The Foundation was merely a fractional holder of timberland which was held for investment purposes. It did not engage in business activity and did not hold itself out as a seller of timber. It did not deal with other timber purchasers.

With regard to the purposes of the unrelated business income tax to prevent unfair competition, it is important to note that the Foundation was not an original party to one of the contracts, had only a nominal interest in the other at the time of negotiation, and that it was a holder of only a minority interest in the timberlands. The price provisions were bargained for at arms length and in good faith and the Foundation's tax exempt status was not a factor in the negotiations. Thus, it is clear that the Foundation was not and could not be a source of unfair competition. It had little control over the cutting business and did not engage in price cutting or unfair competition.

Moreover, it could hardly be said that the plaintiff's activity was "regularly carried on." The Foundation became the holder of a fractional interest in the property which, in the main, was inherited subject to the contracts. The

purchasers did the cutting and processing of the logs. No other purchasers were ever sought, and none have since been sought. It is true that the Hill Group retained a highly respected forester, Mr. David T. Mason, who sat on the boards of the lumber companies for a number of years and had authority to demand a change of management if the lumber companies' profits fell below profits of comparable companies. But this does not support an inference that the Foundation was regularly engaged in a trade or business. The depositions reveal that the change of management provision was included at the behest of the lumber companies so that the then management could be replaced in the event of death or disability. As it turned out, this did not occur, and the Hill group never requested a change of management. The depositions and the testimony at trial also reveal that Mr. Mason's role on the companies' boards was largely passive; he acted as a general advisor on forestry matters and as a watchdog for the Hill interests, but not as an active manager of operations.

■ What is or is not a trade or business is basically a question of fact. Crosby v. United States, *supra*. The decided cases hold, and common sense dictates, that conducting a trade or business requires some business activity beyond the mere receipt of profits. All the Foundation did here was to receive its profits under the cutting contracts. The fact that the return was measured by the lumber companies' profits from the sale of timber and timber by-products does not point to engagement in a trade or business. The sole consideration furnished by the Foundation was its timber. The variable price it received in return was designed to assure the purchasers that they would not have to pay a price beyond that which they could afford. The facts here compel the conclusion that the Foundation was not regularly engaged in timber selling and was not engaged in a "trade or business."

For the foregoing reasons I find that the plaintiff Foundation did not receive "unrelated business income" under these contracts. Defendant's contention that the Foundation was a joint venturer or partner with the lumber companies is not made out. There was no intent to establish such a relationship; there was no sharing of losses and there was only minimal right of control over the operations.

The plaintiff is entitled to judgment against defendant for the sum of $256,-808.44 with interest thereon as provided by law and for its costs. The plaintiff is requested to submit suggested detailed Findings of Fact and Conclusions of Law reflective of these expressions.